IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cr-20205-MSN-tmp |
| | ) | |
| COURTNEY FOX, JEFFREY SEVIER, | ) | |
| DAMIEN RAINEY, DEONTE ALEXANDER, | ) | |
| GREGORY MARTIN, MARVIN REVERAND, | ) | |
| JACQUEZ REVERAND, JAVARIS NELSON, | ) | |
| KEUNTE MILLER, CORTNEY MCINTYRE, | ) | |
| BERNARD BOWDEN, KEENAN FIELDS, | ) | |
| RAKEILARI DONALDSON, CORTEZ | ) | |
| WILLIAMS, JOHN ROUNDS, and | ) | |
| DEWAYNE SANDERS, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## REPORT AND RECOMMENDATION
_____

Before the court by order of reference is a motion to suppress evidence filed by defendant Jacquez Reverand on August 14, 2020. (ECF Nos. 466 & 467.) The government filed a response on September 11, 2020. (ECF No. 490.) For the reasons below, it is recommended that the motion to suppress be denied.

## I.    PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the testimony of Memphis Police Department ("MPD") Officers Benjamin Huff and Maurice Cox, and Special Agent Kyle Murray of the Bureau

of Alcohol, Tobacco, Firearms and Explosives ("ATF"), all three of whom credibly testified at the evidentiary hearing held on October 23 and November 2, 2020. (ECF Nos. 521 & 529.) Audio and video captured by body cameras worn by Officers Huff and Cox were admitted into evidence. (Hr'g Exs. 2 & 3A.) Defendant Jacquez Reverand testified on his own behalf at the hearing. (ECF No. 521.)

On March 4, 2019, MPD officers responded to a shooting in the area of 1081 and 1083 N. Claybrook Street, a duplex located in Memphis, Tennessee. Officer Huff, who was located nearby at the time of the shooting, heard what sounded like "a hundred" shots fired and reported it to dispatch. As Officer Huff drove up Claybrook Street, he observed a male victim of the shooting running down the street and bleeding from a head wound. Officer Huff also observed an individual later identified as Jeffrey Sevier, a co-defendant of Reverand, exit the side door of 1081 Claybrook Street. At that time, a female victim pointed to Sevier and said "that's him, that's him." Officer Huff then detained Sevier.

Officer Cox arrived soon after and took a statement from Sevier while Officer Huff searched for shell casings. Sevier acknowledged exiting 1081 N. Claybrook and stated that he had witnessed the shooting. Sevier said he was present at the residence to buy jackets and that his car was still running across the street. Sevier also told officers that he did not know whether

anyone else was inside the residence. Officer Huff approached the 1081 N. Claybrook residence, from which Sevier had exited, and observed numerous shell casings on the front porch. Officer Huff told Officer Cox they had to clear the house to make sure nobody inside had been shot. Officer Cox knocked on the front doors of both 1081 and 1083 N. Claybrook Street to see if anybody inside had been injured in the shooting. There was no response at either residence. The front entrance of each residence consisted of an interior wooden door and an exterior iron rod door. At the 1081 N. Claybrook residence, both the interior and exterior doors were unlocked. At the 1083 N. Claybrook residence, the iron rod door was locked and the interior wooden door was slightly ajar.[1] Hearing no response from inside, Officers Huff and Cox opened the door to 1081 N. Claybrook Street to perform a safety and welfare check. Upon entry, officers saw a shell casing on the floor inside the door frame and observed marijuana grinders, a digital scale, and baggies on a table inside. Officers did not find any individuals in the house.

---

[1]Officer Huff testified that officers did not initially attempt to enter the front door of 1083 N. Claybrook Street because they lacked the tools to open an iron door and a lieutenant or sergeant was required to make the decision of whether to contact the fire department to obtain the required tools. (ECF No. 532, at 48.)

While waiting for a supervisor to arrive on the scene, officers found more shell casings on the street. Once the supervisors arrived, Officer Huff discovered that although the front door to the 1083 N. Claybrook residence was locked, officers had not checked to see if the side door was unlocked. While walking to the side door, officers observed a bullet hole in the side of the house. Finding the side door unlocked, Officer Huff cracked the door and felt heat coming from inside, a possible indication of someone's presence in the residence. Officers then entered 1083 N. Claybrook Street through the side door to perform a welfare check, approximately eighty minutes after entering 1081 N. Claybrook Street. As soon as Officer Huff opened the door, he observed a glass jar full of white powder near the stove, which had four of its burners lit with the flame on. Officers also located a surveillance system in the residence but did not find any individuals inside the house.

Based on the observations made by officers during the welfare checks at the residences, MPD Sergeant D. Reed applied for and obtained two search warrants for 1081 and 1083 N. Claybrook Street from a Shelby County Judicial Commissioner. (Hr'g Ex. 4 & 5.) During the execution of the state search warrants, law enforcement recovered a Digital Video Recorder ("DVR"), which contained stored footage from multiple cameras mounted on the outside of the duplex.

Prior to the shooting, ATF agents connected 1081 and 1083 N. Claybrook Street to an ongoing investigation of the Memphis Mob street gang for crimes involving narcotics and firearms. Utilizing court-authorized Title III intercepts over target telephones utilized by members of the Memphis Mob street gang, ATF agents identified 1081 and 1083 N. Claybrook Street as residences the organization used to distribute narcotics, also referred to as a "trap house." Based on the state warrants and information obtained through the Title III intercepts, Special Agent Kyle Murray applied for a federal search warrant for the DVR recovered by MPD officers during their execution of the state search warrant for 1083 N. Claybrook Street. (Hr'g Ex. 6.) The undersigned signed and issued the federal search warrant on March 8, 2019. (Id.)

During the execution of the federal search warrant, ATF agents recovered video footage from four surveillance cameras surrounding the duplex, three of which recorded footage of the shooting and law enforcement arriving at the scene and responding to the incident. The video footage of these three angles captured by the surveillance system was admitted into evidence at the suppression hearing. (Hr'g Ex. 3B.) The video footage shows several individuals shooting firearms into the back of a red vehicle. Special Agent Murray identified two of the individuals firing shots as Jacquez Reverand and one of his co-defendants, Gregory Martin. Special

Agent Murray also identified Sevier in the video footage as the person seen leaving 1081 N. Claybrook Street.

At the suppression hearing, the court also heard evidence about Reverand's connection to 1081 and 1083 N. Claybrook Street. Special Agent Murray testified that based on his review of video footage from the duplex's surveillance system, nothing he saw indicated that Reverand lived at the duplex or used it as a residence. Special Agent Murray testified that when reviewing the video footage from March 3, 2019, the night before the shooting, he did not observe Reverand present at the location. Special Agent Murray testified that during the course of five or six months of surveilling 1081 and 1083 N. Claybrook Street, ATF agents conducted overnight surveillance at the duplex on approximately ten occasions. ATF agents did not identify anyone as staying at the duplex overnight on those occasions. Officer Huff testified that he saw a couple of couches at each residence but neither location was furnished with any beds or air mattresses. Officer Cox noted that the 1081 N. Claybrook residence did not appear to be occupied, as there was no food, nothing in the closets or cabinets, and no toothbrush or shower curtains in the bathroom.

Reverand testified regarding his use of 1081 and 1083 N. Claybrook Street. According to Reverand's testimony, he did not permanently reside at the duplex but would occasionally stay at

1083 N. Claybrook Street before spending weekends with his daughter who lived nearby.[2] Reverand also stated that he would occasionally visit the duplex after attending school in the area. Reverand testified that he did not know who owned the duplex or the individuals whose names appeared on the utility bills. Reverand testified that he did not know of anyone living at the duplex full-time and that multiple people were paying the rent. According to Reverand, he sometimes contributed to the rent for 1083 N. Claybrook by giving Sevier money. Reverand testified that he did not have a key to 1081 or 1083 N. Claybrook Street but that he had received permission from Sevier to stay there. Reverand testified that he stored personal items at the duplex, including clothes, shoes, a video game console, a heater, an air mattress, toothbrush, and soap.[3] According to Reverand's testimony, the only "groceries" at 1083 N. Claybrook Street consisted of fast food he stored in

---

[2]When asked about a different address listed on his driver's license, Reverand identified a residence belonging to his mother, which Reverand testified had served as his permanent residence for two or three years. (ECF No. 531, at 45.)

[3]It is unclear from Reverand's testimony whether he stored these personal items at 1081 or 1083 N. Claybrook Street. Reverand testified that the duplex was set up as "two separate houses." (ECF No. 531, at 28.) Reverand's testimony about the personal items he stored at the duplex came in response to being asked "[w]hat, if any, personal items [he] stored at either of those residences[.]" (Id. at 23.) Reverand did clarify his testimony regarding the air mattress on cross-examination, stating that he stored it at 1083 N. Claybrook Street. (Id. at 35.)

the refrigerator. Photos retrieved from Reverand's Facebook account taken at 1083 N. Claybrook, which had been uploaded to Facebook between December 11, 2018 and March 3, 2019, were entered into evidence. (Hr'g Ex. 1.)

There are numerous discrepancies in Reverand's testimony as to when he first began staying overnight at 1083 N. Claybrook Street and how often he stayed there. Reverand testified on direct examination that, prior to March 4, 2019, he would go to the duplex "two, three times a week." (ECF No. 531, at 23.) Reverand testified that he first began staying overnight at 1083 N. Claybrook Street in "2017 or the beginning of 2018" and that he would stay there overnight "two or three times" over the course of a week. (Id. at 24.) Reverand also testified, however, that he would visit the duplex more often than he would stay there overnight (including visits after attending school nearby). (Id.) In addition, when asked on cross-examination to identify the earliest point in time that he had spent the night at 1083 N. Claybrook Street, Reverand answered "[20]17, probably the end of [20]18." (Id. at 48.) Based on this testimony, it is unclear when Reverand first stayed at 1083 N. Claybrook Street or how often he spent the night there.

Another discrepancy in Reverand's testimony pertains to his sleeping arrangements at 1083 N. Claybrook Street. On cross-examination, Reverand acknowledged that there were no beds at the

duplex but testified that he slept on an air mattress when staying at 1083 N. Claybrook Street.[4] (Id. at 35.) Later during cross-examination, Reverand testified that he slept on the couch when staying at 1083 N. Claybrook Street. (Id. at 39.) In response to a follow-up question, Reverand testified that the air mattress had gone flat, although he could not remember when. (Id.)

According to Reverand's testimony, the last time he stayed at 1081 or 1083 N. Claybrook Street prior to the shooting was in February or March of 2019. (Id. at 46.) Critically, Reverand testified that he did not stay overnight at the duplex on March 3, 2019, and he was not present at the duplex on March 4, 2019. (Id. at 40.) However, Special Agent Murray identified Reverand in the video footage of the shooting recorded by the surveillance system at the duplex on March 4, 2019. (ECF No. 532, at 71.) Based on the discrepancies in Reverand's testimony and the evidence presented to the court, the undersigned finds Reverand's testimony regarding his usage of the duplex and his whereabouts on March 4, 2019 to be not credible.

A federal grand jury in the Western District of Tennessee returned a twenty-eight count indictment against Reverand and fifteen co-defendants on August 8, 2019. (ECF No. 3.) Reverand is

---

[4]Officer Huff testified that he did not observe an air mattress inside 1083 N. Claybrook Street. (ECF No. 532, at 31.)

charged in Count 1 (conspiracy to possess firearms in relation to drug trafficking), Count 2 (conspiracy to possess with intent to distribute 1 kilogram or more of heroin), Count 3 (conspiracy to possess with intent to distribute 5 kilograms or more of cocaine), Count 18 (brandishing and discharging a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and (2)), Count 23 (possession with intent to distribute heroin), and Count 24 (using and carrying firearms in relation to drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (2)). (Id. at 4-18.)

## II.  PROPOSED CONCLUSIONS OF LAW

Reverand challenges the constitutionality of the entries into 1081 and 1083 N. Claybrook Street, and seeks to suppress the evidence recovered during the execution of the two resulting state search warrants and the federal search warrant issued by the undersigned, arguing that the officers' alleged illegal entry tainted these warrants.[5]

---

[5]Although not raised by the parties, the undersigned notes that the act of issuing a search warrant does not disqualify the authorizing judge from subsequently presiding over a motion to suppress evidence recovered during law enforcement's execution of that warrant. See United States v. Lawson, 780 F.2d 535, 540 (6th Cir. 1985); see also United States v. Mathis, No. 18CR181DWFLIB, 2018 U.S. Dist. LEXIS 147285, 2018 WL 4473529, at *10 (D. Minn. July 17, 2018), report and recommendation adopted, 2018 U.S. Dist. LEXIS 145380, 2018 WL 4062741 (D. Minn. Aug. 27, 2018)(collecting cases).

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "To determine whether a Fourth Amendment violation has occurred, we ask two primary questions: first, whether the alleged government conduct constitutes a search within the meaning of the Fourth Amendment; and second, whether the search was reasonable." Taylor v. City of Saginaw, 922 F.3d 328, 332 (6th Cir. 2019).

## A.    Expectation of Privacy

For Fourth Amendment purposes, "a search occurs when a government official invades an area in which 'a person has a constitutionally protected reasonable expectation of privacy.'" Id. (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Under the Katz framework, "there are two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit 'an actual (subjective) expectation of privacy' in the place or thing searched; second, the expectation is one 'that society is prepared to recognize as 'reasonable.''" United States v. May-Shaw, 955 F.3d 563, 567 (6th Cir. 2020) (quoting Katz, 389 U.S. at 361). "To determine whether such an expectation of privacy is reasonable, this court considers 'the person's proprietary or possessory

interest in the place to be searched or item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.'" United States v. Allen, 720 F. App'x 254, 257 (6th Cir. 2018) (quoting United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005)). It is well-settled that an overnight guest can claim a legitimate expectation of privacy in a residence sufficient to challenge the validity of a warrantless search. See Minnesota v. Olson, 495 U.S. 91, 96-97 (1990) ("[Plaintiff]'s status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."); see also Minnesota v. Carter, 525 U.S. 83, 90 (1998) ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").

    As stated above, the undersigned finds Reverand's testimony to be not credible, and as a result, he has failed to carry his burden of showing that he has "standing" to challenge the entries and searches of the duplex. However, even if the court found that Reverand had testified credibly regarding his usage of the duplex,

Reverand would have no legitimate expectation of privacy as to 1081 or 1083 N. Claybrook Street.[6]

In regard to 1081 N. Claybrook Street, Reverand never testified to staying overnight specifically at 1081 N. Claybrook Street. Much of his testimony pertained only to 1083 N. Claybrook Street or referred to "the duplex" as a singular unit. For instance, Reverand testified to storing personal belongings - clothes, shoes, video game console, heater, air mattress, toothbrush, soap – at the duplex but did not indicate whether he stored these items at 1081 or 1083 N. Claybrook Street.[7] Officer Cox testified that the 1081 N. Claybrook residence did not appear to be occupied, as there was no food, nothing in the closets or cabinets, and no toothbrush or shower curtains in the bathroom. The video footage recorded by the body cameras of both Officer Cox and Officer Huff demonstrate the stark interior of the residence.

As to 1083 N. Claybrook Street, Reverand testified that although it was not his primary residence, he periodically stayed

---

[6]To the extent that Reverand seeks to challenge both of the state search warrants, he must establish a legitimate expectation of privacy as to each residence because, as noted above, he testified to the duplex being set up as "two separate houses." (ECF No. 531, at 28.)

[7]Reverand did clarify on cross-examination his testimony that he stored the air mattress at 1083 N. Claybrook Street. (ECF No. 531, at 35.) Officer Huff testified that he did not observe an air mattress inside 1083 N. Claybrook Street. (ECF No. 532, at 31.)

overnight there with Sevier's permission. However, Reverand testified that he did not stay overnight at 1083 N. Claybrook Street on the night before the shooting and that, prior to the shooting, he had last stayed there in February or March of 2019. Reverand additionally testified that he did not have a key to the residence or know who owned it. According to Reverand, he also did not know the individuals whose names appeared on the utility bills. As stated above, Reverand testified to storing personal belongings at the duplex but identified only the air mattress as being stored at 1083 N. Claybrook Street. However, Officer Huff testified that he did not see an air mattress inside the residence, and Reverand later testified that the air mattress had gone flat. Again, the video footage recorded by the body camera worn by Officer Huff captured the stark interior of the residence. There were no furnishings in the bedroom, and the living room contained two couches and a television. According to Reverand, the only food in the residence was fast food he stored in the refrigerator. Based on the video recordings and evidence before the court, 1083 N. Claybrook Street did not appear to be occupied in a residential capacity at the time of the search. Instead, consistent with Special Agent Murray's testimony, the residence appeared to be maintained as a trap house used to distribute narcotics. While this fact by itself does not preclude Reverand from asserting a

privacy interest, the use of the location primarily for drug distribution purposes (as opposed to residential purposes) weighs against his claimed expectation of privacy. See United States v. Harris, 255 F.3d 288, 295 (6th Cir. 2001). Put another way, Reverand has not sufficiently established that he qualified as an overnight guest at the time of the search; rather he was someone who would periodically visit the residence "for the sole purpose of engaging in drug-related business transactions." See id.; see also Carter, 525 U.S. at 89-90. Because Reverand lacked a legitimate expectation of privacy as to either residence in the duplex, it is recommended that his motion to suppress be denied.

**B.    Emergency Aid Exception**

Even if Reverand had a legitimate expectation of privacy in 1081 and 1083 N. Claybrook Street at the time of the searches, his motion to suppress would nevertheless be denied. "[A] warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." United States v. Trice, 966 F.3d 506, 512 (6th Cir. 2020) (quoting Morgan v. Fairfield Cty., 903 F.3d 553, 560-61 (6th Cir. 2018)). One such exception is for "exigent circumstances," which "arise when an emergency situation demands immediate police action that excuses the need for a warrant." Johnson v. City of Memphis, 617 F.3d 864, 868 (6th Cir. 2010) (citing United States v. Radka, 904 F.2d 357,

361 (6th Cir. 1990); <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750 (1984)).

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006). "Thus, law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" <u>Michigan v. Fisher</u>, 558 U.S. 45, 47 (2009) (quoting <u>Brigham City</u>, 547 U.S. at 403). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." <u>Id.</u> (citing <u>Brigham City</u>, 547 U.S. at 404-05). "It requires only an objectively reasonable basis for believing, that a person within [the house] is in need of immediate aid." <u>Id.</u> (internal quotation marks and citations omitted); <u>see also</u> <u>id.</u> at 49 ("Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception.").

Reverand argues in his motion to suppress that the warrantless entry and search of 1081 and 1083 N. Claybrook Street by MPD officers violated the Fourth Amendment. The government argues that the emergency aid exception justified the entries and that officers were entitled to conduct a "protective sweep" following the valid

entries into the residences.[8] Reverand seemingly abandoned his argument regarding the entry of 1081 N. Claybrook Street at the suppression hearing. To the extent Reverand seeks to maintain this argument, the emergency aid exception clearly applies to the entry of 1081 N. Claybrook Street, which occurred approximately ten minutes into the video footage recorded by the body cameras worn by Officer Huff and Officer Cox. (Hr'g Exs. 2 & 3A.) The crime scene involved one victim who had been shot in the head, and Officer Huff testified to seeing Sevier, identified by another victim as the shooter, exiting the residence. Sevier did not tell officers that it was his residence. Rather, he said he was there to buy jackets and that his car was still running across the street. Sevier also told officers that he did not know whether anyone else was inside the residence. Moreover, officers found numerous bullet casings on the front porch of the duplex. Evidence of gunfire falls within the category of "outward manifestations of violence that often support a finding of exigency." Schreiber v. Moe, 596 F.3d 323, 331 (6th Cir. 2010) (citing United States v. Huffman, 461 F.3d 777, 784 (6th Cir. 2006); Dickerson v. McClellan,

_____

[8]The Supreme Court has defined a "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id.

101 F.3d 1151, 1159 (6th Cir. 1996)). Based on the above, there was an objectively reasonable basis for believing somebody in the house might be seriously injured. Accordingly, the emergency aid exception applies to the entry of 1081 N. Claybrook Street.[9]

As to the entry of 1083 N. Claybrook Street, Reverand contends that the eighty-minute gap in time following the search of 1081 N. Claybrook Street before MPD officers entered the other side of the duplex undermines any professed emergency need for the warrantless entry. The government asserts that the crime scene remained highly active. For example, during that time, officers were spread out between four areas of investigation, ambulances were attending to the victims of the shooting, and additional shell casings were found on the street. Officers knocked on the front doors of both 1081 and 1083 N. Claybrook Street, which share the front porch where numerous bullet casings were found, prior to their entry of 1081 N. Claybrook Street. The front door to 1083 N. Claybrook Street was locked, and no response came from inside. Officer Huff

---

[9]As Reverand acknowledges in his motion to suppress, "seizures of items that are in plain view and made after entries under exceptions to the warrant requirement are legitimate." United States v. Johnson, 106 F. App'x 363, 367 (6th Cir. 2004) (citing Horton v. California, 496 U.S. 128, 134-35 (1990)). Therefore, because the entry of 1081 N. Claybrook Street falls within the emergency aid exception, MPD officers were entitled to seize contraband within plain view. Officers instead decided to apply for a search warrant based on their observations within the duplex.

testified that officers could not attempt entry through the front door at that time because they lacked the tools required to open a locked iron door. Officer Huff also testified that a lieutenant or sergeant was required to make the decision of whether to contact the fire department to obtain the necessary tools.

While it took officers nearly eighty minutes to enter 1083 N. Claybrook Street, this delay was due to the officers at the scene waiting for their supervisors to arrive and the delayed discovery of the open side door. While approaching the side door, Officer Huff observed a bullet hole in the side of the residence. Officer Huff testified that based on his knowledge and experience, bullets can pass through the walls of a residence. Officer Huff tried the doorknob on the side door and found the door to be unlocked. Officer Huff testified that he could feel heat emanating through the crack in the doorway, which told him that somebody might be inside. Based on the above, there was an objectively reasonable basis for believing somebody in the house might be seriously injured. Accordingly, the emergency aid exception applies to the entry of 1083 N. Claybrook Street.[10] For this additional reason,

---

[10]Because the entry of 1083 N. Claybrook Street falls within the emergency aid exception, MPD officers were entitled to seize contraband within plain view, such as the container of white powder next to the stove. Johnson, 106 F. App'x 363, 367. Officers instead decided to apply for a search warrant based on their observations within the duplex.

it is recommended that the motion to suppress be denied.[11]

## III. RECOMMENDATION

Based on the above, it is recommended that the motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

December 23, 2020
Date

**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A**

---

[11]Because Reverand lacks a legitimate expectation of privacy as to the residences, and because the entries fall within the emergency aid exception, the court need not address whether the good-faith exception to the exclusionary rule applies. For completeness, however, the undersigned will briefly address Reverand's argument that the good-faith exception does not apply because MPD Sgt. Reed included false statements in his state search warrant applications. See United States v. Leon, 468 U.S. 897, 905 (1984); see also Franks v. Delaware, 438 U.S. 154 (1978). Specifically, Reverand challenges the veracity of Sgt. Reed's statements that MPD officers observed Sevier exiting 1081 N. Claybrook Street and that a victim at the scene identified Sevier as the shooter. (ECF No. 466-1, at 6.) As stated above in the Proposed Findings of Fact, Officer Huff credibly testified at the suppression hearing that he saw Sevier exit 1081 N. Claybrook Street and that a victim identified Sevier as the shooter. The DVR video also showed Sevier leaving 1081 N. Claybrook Street. There were no false statements in Sgt. Reed's state warrant applications.

COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.